**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
**ELYSE McCANTS and JULIETTE DAILEY,**

                                          **Plaintiffs,**                    **REPORT AND**
                                                                            **RECOMMENDATION**
                                                                            **CV-01-6029 (CBA)**

              **-against-**

**THE CITY OF NEW YORK, THE NEW YORK**
**CITY BOARD OF EDUCATION, SANDRA**
**KASE, Individually and In Her Official Capacity,**
**and JERRY CIOFFI, Individually and In His**
**Official Capacity,**

                                          **Defendants.**
-------------------------------------------------------------X
**GOLD, S., U.S.M.J.:**

                                    __Introduction__

          Elyse McCants and Juliette Dailey (collectively, "plaintiffs")[1] bring this lawsuit against

the City of New York ("the City"), the New York City Board of Education ("the Board of

Education"), Sandra Kase, individually and in her official capacity, and Jerry Cioffi, individually

and in his official capacity (collectively, "defendants"). Plaintiffs allege several causes of action.

In their federal claims, brought pursuant to Title 42, Sections 1983 and 1985, plaintiffs assert

they were retaliated against for engaging in protected speech, discriminated against based upon

their race, and reassigned without formal charges, in violation of the First Amendment and the

Equal Protection and Due Process clauses of the Constitution. Plaintiffs also bring state law

_____

          [1]Plaintiffs' papers submitted in opposition to summary judgment refer to plaintiff on
some occasions as Judith Dailey and on others as Judith Daily. Because the spelling "Dailey" is
used in the case caption, I use that spelling throughout this report. Moreover, although plaintiffs'
papers identify the docket number of this case as 00cv864, the correct docket number is
01cv6029.

                                          1

claims for slander and intentional and negligent infliction of emotional distress. Defendants have moved for summary judgment. Their motion has been referred to me for report and recommendation by the Honorable Carol B. Amon. Docket Entry 36. For the reasons stated below, I respectfully recommend that defendants' motion be granted.

## Background

Plaintiffs are teachers employed by the Board of Education. Their claims in this case arise from their dismissals from their teaching assignments at P.S. 40 in Queens and their reassignments to the Superintendent's Office in June of 2000. At that time, Juliette Dailey had been teaching at P.S. 40 in Queens for sixteen years and Elyse McCants had been teaching there for ten years. Dailey Aff. ¶ 3; McCants Aff. ¶ 3. Plaintiffs were reassigned after reports appeared in the media highlighting problems at the school. Compl. ¶¶ 22, 23. Plaintiffs contend they were reassigned without due process, as a result of race discrimination, and in retaliation for speaking to the media about conditions at P.S. 40. Compl. ¶¶ 22, 23, 25. Defendants contend that McCants was reassigned because observations of her teaching revealed her to be incompetent, and that Dailey was reassigned only for a brief period of time while allegations she harassed a fellow teacher were investigated. Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts ("Def. R56.1") ¶¶ 22, 70.

In June of 1999, the Chancellor's District took control of forty schools, including P.S. 40, because of the schools' poor academic performance. Def. R56.1 ¶ 3, Ex. C. Teachers assigned to schools in the Chancellor's District received a 15% pay raise in return for undergoing additional training and taking on additional teaching responsibilities. Id. In September, 1999, the Daily News ran a series of articles describing problems at P.S. 40. Def. R56.1 ¶ 4; Def. Ex.

D, E.  In May of 2000, Channel Five News aired a three-part series (the "Channel Five

broadcasts") revealing continuing problems at the school.  Def. R56.1 ¶ 5; Def. Ex. F.  The

Channel Five broadcast which aired on May 23, 2000, the first night of the series, included a

video recording taken with a hidden camera allegedly operated by two P.S. 40 teachers.  Def.

R56.1 ¶ 6.  The video recording revealed an elementary school in chaos, with one child throwing

a chair across a room and another walking down a hallway repeatedly kicking the walls, an

assistant principal yelling at and shoving a child, and a teacher dragging a child in the hallway.

Def. Ex. F.  During the same broadcast, two teachers, their identities hidden by dark shadows,

claimed, among other things, that older gang members from the surrounding neighborhood were

permitted to enter the school, and that young female students were sexually assaulted by older

boys in the school building.  Def. R56.1 ¶¶ 6-7, Ex. F.  In a second segment broadcast the

following day, McCants was interviewed and stated, apparently with respect to the prior day's

reporting, that "[i]t was very truthful in some aspects, but the entire school is not like that.  I can

only hope now something positive will come out of it."  Def. R56.1 ¶ 9.  Plaintiffs contend that,

during a P.S. 40 staff meeting held in late May, Dr. Kase told the teachers present that she would

find the people responsible for secretly recording the videotape made inside the school "and they

would be sorry."  Dailey Aff. ¶ 18; McCants Aff. ¶ 14.

The New York Daily News published another article about the school on June 2, 2000.

McCants was quoted in the article as saying "If anything, the school was worse [after being made

part of the Chancellor's District] than before.  None of the promises were kept, though many

teachers tried hard."  Def. R56.1 ¶ 12; Def. Ex. GG.

During the week of the Channel Five broadcasts, Dr. Kase visited P.S. 40 and observed

several classes, including classes taught by McCants. Def. R56.1 ¶ 14; Kase Dep. Vol. II 16-17. Kase first observed McCants during the school day on May 23, 2000, before the first segment of the Channel Five broadcasts aired. Def. R.56.1 ¶ 15 and Ex. G. Based on her observations, Dr. Kase became concerned about McCants' teaching ability and, as a result, asked the Director of Professional Development for the Chancellor's District, Dr. Anne Gargan, to observe and evaluate McCants' performance. Def. R56.1 ¶ 17; Def. Ex. G.

Dr. Gargan visited McCants' pre-kindergarten class on June 5, 2000. Gargan subsequently wrote a memorandum to Dr. Kase detailing what she observed, which included a period of twenty minutes when no meaningful instruction or supervision took place. Def. Ex. I. Gargan opined in her memorandum that she "seriously question[ed] Ms. McCants' ability to provide meaningful instruction to pre-kindergarten children" and that McCants was "in serious need of professional development in the areas of instruction, classroom management, and theories of child development." Def. Ex. I. At the end of June, 2000, McCants received an unsatisfactory, or "U", rating on her annual performance evaluation. Def. R56.1 ¶ 31; Def. Ex. O. In a letter dated June 7, 2000, Dr. Kase informed McCants that she was being reassigned to the Office of the Supervising Superintendent effective June 12, 2000. Def. Ex. J.

Although Dr. Kase did not state the reason for McCants' reassignment in her letter, defendants proffer that she was reassigned because of the concerns about her competence Dr. Kase and Dr. Gargan had after observing her teach. Def. R56.1 ¶ 22; Ex. G, I. McCants emphasizes that the reassignment decision was made less than two weeks after she appeared on a Channel Five broadcast regarding conditions at P.S. 40 and less than one week after she was quoted in an article about the school in the Daily News. Pl. Ex. B; McCants Aff. ¶ 21.

McCants' reassignment to the Superintendent's Office lasted for more than a year, from June, 2000 to September, 2001. McCants Aff. ¶ 4. While at the Superintendent's Office, McCants had no work assignments. McCants Aff. ¶ 30. Moreover, McCants was required to submit to an evaluation by a psychologist. Def. R56.1 ¶¶ 35, 38, 40. Defendants assert that this evaluation was required because of McCants' erratic behavior, excessive lateness and absences, and psychiatric history. Def. R56.1 ¶¶ 35, 38; Def. Ex. N. The psychologist who evaluated McCants concluded that she "should be able to return to previous levels of functioning", i.e., return to teaching, provided that the stresses she faced at school were not severe. Def. Ex. T.

McCants filed grievances with her union with respect to her unsatisfactory rating, the letters prepared by Dr. Kase and Dr. Gargan concerning their observations, a letter by Jerry Cioffi, Deputy Superintendent for the Chancellor's District, alleging that McCants had been insubordinate, and having lost the opportunity to teach during summer school. Def. R56.1 ¶¶ 32, 34, 39, 43, 44. Although McCants filed Step II and Step III appeals, her grievances were denied with minor exceptions.[2] Def. R56.1 ¶¶ 39, 44. McCants and the Board of Education then entered into a stipulation providing that McCants would be reassigned to P.S. 116 in Queens as of June 6, 2001, Dr. Kase's letter would be removed from her file, and her "U" unsatisfactory rating would be changed to an "S", or satisfactory, rating. Def. R56.1 ¶ 45.

Defendants assert that plaintiff Dailey was reassigned briefly because of an investigation into allegations of harassment made by a fellow teacher, Harsha Patni. Patni began teaching at P.S. 40 in September of 1999. Def. R56.1 ¶ 54; Def. Ex. BB. On May 27, 2000 Patni received a

_____

[2]The hearing officer required Dr. Kase to modify her letter and delete a paragraph describing observations she claimed to have made on May 24, 2000, because school was not in session on that date. Def. R56.1 Ex. P.

threatening phone call telling her to leave P.S. 40. Pl. Ex. E. Patni then received three threatening notes at school, two of which disparagingly referred to Patni as white. Def. R56.1 ¶¶ 58, 60 and 64. Patni informed the principal of P.S. 40, Judith Tyler, who in turn forwarded the notes to Dr. Kase. Pl. Ex. E; Def. R56.1 ¶¶ 59, 61, 65. On June 6, 2000, Patni filed a complaint with the New York City Police Department. Def. R56.1 ¶ 63. Patni was interviewed by Detective Devon Walters. Although Patni did not assert to Detective Walters that she believed Dailey was the person who had threatened her, Patni did tell Walters that she and Dailey did not get along. Def. R56.1 ¶ 68; Def. Ex. II. Although Detective Walters made repeated efforts to contact Dailey, he never reached her, and ultimately learned from Dailey's attorney that he had advised Dailey not to speak to the police. Def. Exs. KK, LL, MM. The police closed their investigation in July, 2000, and concluded that the incidents directed toward Patni were not bias-related, but were instead the "result of union and administrative problems at the school." Def. Ex. JJ. Dailey was never arrested or charged with harassing Patni, nor was there any formal finding that Dailey had been the one who made the threatening calls or sent the threatening notes.

In a letter dated June 7, 2000, Dr. Kase informed Dailey that she was being reassigned to the Office of the Regional Superintendent, effective June 9, 2000. Pl. Ex. B. Although the letter did not state the reason for the reassignment, Dr. Kase stated in her deposition that Dailey was reassigned because of the harassment allegations made by Patni. Kase Dep. Vol. I 37; Def. R56.1 ¶ 70. Dailey initially reported to the Superintendent's Office, but went on medical leave only a few days after having been reassigned. Dailey Aff. ¶ 32.

Dailey had been recognized as a "star" teacher at P.S. 40 and parents rallied for her return. Pl. Ex. J-L. Nevertheless, Dailey received an unsatisfactory annual performance

evaluation at the end of June, 2000.  Def. R56.1 ¶ 81.  After Dailey filed a grievance, however, the evaluation was revised to a satisfactory "S" rating.  Def. R56.1 ¶ 83.  In September of 2000, Dailey requested and received a teaching position at P.S. 121 in Queens.  Def. R56.1 ¶ 85; Dailey Aff. ¶ 32.

McCants and Dailey claim in this lawsuit that the reasons advanced by defendants for their reassignments are pretextual, and that they were in fact reassigned to the Superintendent's Office because school administrators believed they participated in the Channel Five broadcasts. McCants Dep. 92; Dailey Dep. 34, 86.  More specifically, McCants alleges that school officials retaliated against her because they suspected she was one of the teachers who appeared in shadow during the Channel Five News broadcast, because of her comments to Channel Five News during the second day of the broadcast, and because of the statement she made to the Daily News as reported on June 2, 2000.  McCants Aff. ¶ 31.  Dailey alleges that the school administration retaliated against her because it suspected that she, too, was involved in the Channel Five broadcast.  Dailey Dep. 86.

Dailey returned to teaching at a new school in September 2000, and McCants did so in June, 2001.  Def. R56.1 ¶ 48, 85.  According to defendants, both were paid the 15% pay differential afforded to teachers in the Chancellor's District, and summer school salaries, throughout their assignment to the Superintendent's Office.  Def. R56.1 ¶ 47, 50, 83-84.

### Discussion

A.    Standard for Summary Judgment

In reaching a summary judgment determination, the Court must assess whether there are any genuine issues of material fact to be tried.  Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,

933 F.2d 162,167 (2d Cir. 1991). A factual dispute is material if it "might affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). The Court resolves any ambiguities and draws all reasonable inferences in favor of the nonmoving party. See Coach Leatherware, 933 F.2d at 167. However, "mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment," who must instead "set forth specific facts ... showing a genuine issue exists for trial." Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).

To facilitate a court's decision as to whether material factual issues exist, Local Civil Rule 56.1 requires parties seeking and opposing summary judgment to file short, concise statements of fact. The movant is required to file a statement of facts as to which there is no genuine issue to be tried, and the opposing party must then file a statement of facts as to which it is contended there exists a genuine issue for trial. The opposing party's statement must "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party." Local Civil Rule 56.1(a), (b). Furthermore, "[e]ach statement of material fact . . . must be followed by citation to evidence which would be admissible" at trial. Local Civil Rule 56.1(d). Defendants complied with this rule and filed a Rule 56.1 "Statement of Undisputed Facts" with their Memorandum of Law. Def. R56.1. Plaintiffs filed a document styled as "Plaintiff's Rule 56.1 Statement." The document purports in its first paragraph to be a statement of material facts "as to which there is no genuine issue to be tried," and does not include either a statement of disputed facts for trial or paragraphs responding to defendants' statement as required by the local rule. More significantly, plaintiffs' Rule 56.1 Statement lacks

any citations to supporting evidence whatsoever.

Plaintiffs' violation of Local Rule 56.1 has made it more difficult for the Court to review and determine the merits of the pending motion. However, rather than recommend defendants' motion be granted based upon plaintiffs' failure to comply with applicable rules, I have carefully reviewed all of the evidence plaintiffs submitted with their Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment.[3] For the reasons set forth below, I have determined that plaintiffs have failed to submit sufficient evidence in admissible form to raise genuine issues of material fact for trial.

B.    Burden of Proof

In an employment discrimination case, plaintiff bears the initial, minimal burden of establishing a prima facie case of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824 (1973). See also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 n.1, 113 S.Ct. 2742, 2746 n.1 (1993) (applying the McDonnell Douglas test in a Section 1983 discrimination case). "The burden then ... shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. at 1824. Finally, the burden of production shifts back to plaintiff to establish that the employer's stated reason is simply a pretext, and that the adverse action was in fact motivated by discrimination. Id. at 804, 93 S.Ct. at 1825. While the burden of production

_____

[3]Plaintiffs' evidence, attached as exhibits A through Q to the declaration of their counsel, Susan Penny Bernstein, includes a videotape of the news broadcasts, the letters of reassignment, six pages of deposition testimony of Dr. Kase, deposition testimony of Harsha Patni, an incident report and police reports concerning the threats Patni received, news articles, affidavits by the plaintiffs, and a psychological evaluation of McCants. Plaintiffs' Memorandum of Law in Opposition to Summary Judgment refers at pages 9-10 to Exhibits R and S, yet they are not attached to or listed in Bernstein's declaration and have not otherwise been submitted by plaintiffs to the court.

shifts, the plaintiff at all times bears the ultimate burden of proving discrimination. St. Mary's, 509 U.S. at 507, 113 S.Ct. at 2747. Thus, in deciding a summary judgment motion in the employment discrimination context, the central question is "whether the plaintiff has presented sufficient evidence to permit a reasonable jury to conclude that a defendant's decisions were motivated at least in part by an impermissible reason." Shafrir v. Ass'n of Reform Zionists of Am., 998 F. Supp. 355, 360 (S.D.N.Y. 1998). See also Scottish Air Int'l, Inc. v. British Caledonian Group, PLC, 81 F.3d 1224, 1230 (2d Cir. 1996) (defendants may obtain summary judgment "by pointing out that evidence needed to support an essential element of [plaintiffs'] burden of proof is absent").

C.    Plaintiffs' First Amendment Retaliation and Race Discrimination Claims

A public employee retains a First Amendment right to comment on matters of public concern, and may not be punished in her employment for exercising that right. Pickering v. Bd. of Educ., 391 U.S. 563, 88 S.Ct. 1731 (1968). "In order to establish a First Amendment claim of retaliation as a public employee, [a plaintiff] must show that '(1) h[er] speech addressed a matter of public concern, (2) [s]he suffered an adverse employment action, and (3) a causal connection existed between the speech and the adverse employment action.'" Konits v. Valley Stream Cent. High Sch. Dist., 394 F.3d 121, 124 (2d Cir. 2005), quoting Cobb v. Pozzi, 363 F.3d 89, 102 (2d Cir. 2003); see also  Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002). For speech to be constitutionally protected, it must pertain to "matters of public concern" and not merely to "matters only of personal interest." Connick v. Myers, 461 U.S. 138, 147, 103 S.Ct. 1684, 1690 (1983) (finding that an employee questionnaire was primarily concerned with one employee's dissatisfaction). See also Ezekwo v. New York City Health & Hosps. Corp., 940 F.2d 775 (2d

Cir. 1991) (finding that one physician's complaints about the operation of her residency program were not constitutionally protected as speech on matters of public concern). Even where a plaintiff satisfies the elements set forth in <u>Konits</u>, the government employer may escape liability if it is able to establish that the same adverse employment action would have been taken even in the absence of any protected speech. <u>Locurto v. Safir</u>, 264 F.3d 154, 166 (2d Cir. 2001).

The essence of plaintiffs' Equal Protection claims under Section 1983 and their Section 1985 conspiracy claims is race discrimination. A plaintiff asserting an equal protection claim must establish that she was treated differently than similarly situated individuals because of her race. <u>City of Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432, 439, 105 S.Ct. 3249 (1985). As in a First Amendment claim, the plaintiff must establish both an adverse employment action and a causal connection between the alleged discrimination and the adverse action. <u>St. Mary's</u>, 509 U.S. at 508, 113 S.Ct. at 2748. To establish a § 1985 claim, plaintiff must put forth evidence of discriminatory animus by the conspirators. <u>Griffin v. Breckenridge</u>, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798 (1971). <u>See</u> <u>also</u> <u>Town of West Hartford v. Operation Rescue</u>, 991 F.2d 1039, 1044-46 (2d Cir. 1989) (reaffirming the requirement of invidious class-based discrimination to sustain a § 1985 claim).

Plaintiffs' evidence of causation must be sufficient to establish at least an inference that the protected speech or racial discrimination was a "substantial motivating factor in the adverse employment action. . . ." <u>Morris v. Lindau</u>, 196 F.3d 102, 110 (2d Cir. 1999). Causation may be established by direct or circumstantial evidence. <u>Morris</u>, 196 F.3d at 110. Although causation is often difficult to establish, "[p]laintiffs may not rely on conclusory assertions of retaliatory motive, but must offer instead some tangible proof to demonstrate that their version of what

occurred was not imaginary." Id. at 111. On the other hand, "[s]ummary judgment is precluded where questions regarding an employer's motive predominate in the inquiry regarding how important a role the protected speech [or discrimination] played in the adverse employment decision." Id. at 110. In short, to defeat summary judgment, plaintiffs must point to sufficient evidence to support a finding that the actual reason they were reassigned was because of their race or because they engaged in protected speech.

*Plaintiff McCants' First Amendment Claim*

McCants argues that she was reassigned because she spoke out in the media about the problems at P.S. 40. McCants has presented evidence that she spoke with television and print reporters, criticizing the school, prior to her reassignment. Def. Ex. F; McCants Aff. ¶¶ 18-21.[4] Thus, McCants has made a prima facie showing that she engaged in constitutionally protected speech and was reassigned as a result. The burden therefore shifts to defendants to offer a legitimate explanation for McCants' reassignment.

Defendants have offered evidence indicating that McCants was reassigned because administrators were concerned about her competence. Defendants offer Dr. Kase's deposition testimony and a letter from Dr. Kase to McCants, both of which detail Dr. Kase's observations of McCants' teaching. Kase Dep. Vol. II 36-37; Def. Ex. G. According to defendants, on three occasions, Dr. Kase observed McCants outside of the classroom while class was in session and saw children conversing instead of being provided with instructional activities by McCants. Def.

---

[4]McCants offers evidence of her appearance in 1990 on "Like It Is," presumably as evidence of additional protected speech for which she suffered retaliation. Pl. Ex. A. McCants' appearance in 1990 does not give rise to an inference of retaliation because of the ten years which elapsed between the speech and any adverse employment action. See Gorman-Bakos v. Cornell COOP Extension of Schenectady County, 252 F.3d 545, 554-55 (2d Cir. 2001).

Ex. G. Additionally, at Dr. Kase's request, Dr. Gargan observed McCants in her classroom and found "an inappropriate use of students' time, an inadequate implementation of appropriate curriculum, and a lack of knowledge of the principles of child development evidenced by Ms. McCants." Def. Ex. I. Defendants further point out that other teachers spoke to the media and made critical statements about events at P.S. 40, but that there is no evidence that any of these other teachers suffered any retaliation. See Def. Ex. D, E; McCants Dep. 47.

Defendants having met their burden, McCants was required to offer evidence to establish pretext under McDonnell Douglas. Plaintiff McCants attempts to establish pretext by arguing in her Memorandum of Law that Dr. Kase's statements concerning her observations are "false and inaccurate" and that "[d]efendants cannot offer any proof that support Gargan's observations." Pl. Mem. 8. These conclusory assertions are insufficient to overcome defendants' motion.

McCants next argues that the incompetence explanation must be a pretext because Dr. Gargan's memo to Dr. Kase is dated June 7, 2000, the very same date McCants received notice that she was reassigned. Pl. Mem. 9. It seems reasonable to infer, however, that Dr. Kase and Dr. Gargan spoke after Dr. Gargan's observations on June 5, before the reassignment letter issued on June 7, and that the sequence of events does not preclude defendants' having considered Dr. Gargan's observations when deciding that McCants should be reassigned.

A finder of fact may, under some circumstances, draw an inference of retaliatory motive when an adverse employment action follows closely on the heels of protected activity. See Gorman-Bakos, 252 F.3d at 554-55; Grant v. Bethlehem Steel Corp., 622 F.2d 43, 46 (2d Cir. 1980) (recognizing that a plaintiff can meet its burden under McDonnell Douglas by showing that retaliatory treatment closely followed protected activity). McCants was reassigned only two

weeks after reports of her statements appeared in the media. However, the facts of this case are distinct from the typical case in which an inference is drawn based upon the timing of an adverse employment action, because here, the same media reports which publicized McCants' statements also drew public attention to deficiencies at P.S. 40. Thus, it is at least as reasonable to infer that the media reports triggered Dr. Kase's legitimate evaluation of the quality of teaching at the school as it is to infer that Dr. Kase chose to scrutinize McCants' competence in retaliation for McCants' protected speech.

McCants also contends she "was told by teachers at P.S. 40 that [she] was being accused of being one of the teachers that did the taping at P.S. 40 and that [she] was removed because of the Channel Five broadcasts and the Daily News article." McCants Aff. ¶ 31. However, evidence submitted in connection with a summary judgment motion must be in a form which would be admissible at trial. Fed. R. Civ. P. 56(c) and (e). Anything McCants was told by other teachers about statements made by school administrators would be inadmissible hearsay, at least in the absence of testimony from a teacher who actually heard the statements as they were made.

*Plaintiff Dailey's First Amendment Claim*

Dailey has failed to present any evidence that she participated in any protected speech before her reassignment on June 7, 2000. Dailey alleges that she was reassigned because the school administration suspected that she was involved in the Channel Five broadcasts. Dailey Dep. 34, 86. Dailey denies having had any involvement in the surreptitious taping which became part of the broadcasts. Dailey Aff. ¶ 23. In fact, on the second day of the broadcasts, Channel Five reported specifically that Dailey was not involved. Def. Ex. F. Dailey offers no evidence other than her own conjecture indicating that school administrators believed she was involved in

the broadcasts.  Although Dailey was interviewed by Channel Five reporters, the interview took place *after* her reassignment on June 9, 2000.  Def. Ex. F; Dailey Aff. ¶ 23; Dailey Dep. 32-33.  It is plain as a matter of simple logic that plaintiff's appearance on Channel Five after her reassignment cannot provide a basis for a claim of retaliation.  See <u>Bernheim v. Litt</u>, 79 F.3d 318, 325 (2d Cir. 1996).

In her Memorandum of Law, Dailey also argues she suffered retaliation for expressing her views about P.S. 40 at various meetings attended by administrators, parents, and the public. Apparently, Dailey was elected by her follow staff members to chair a leadership committee. Daily Aff. ¶ 6.  Although Dailey argues in her Memorandum that she was "very vocal in expressing her concerns with the academic and physical conditions at P.S. 40 to her supervisors and the public" in her role as leadership chair, Pl. Mem. 9, and that there were "numerous public meetings in the P.S. 40 community at which Dailey spoke out about conditions at the school," Pl. Mem. 10, she cites no *evidence* that she participated in protected speech as the chairperson or that defendants heard her speak or reacted negatively to, or even learned about, what she said. Dailey's affidavit submitted in opposition to defendants' summary judgment motion, for example, makes no mention of these events.  Because of the complete lack of evidence that she engaged in any protected speech, plaintiff Dailey cannot sustain her burden of establishing First Amendment retaliation.

Even if I were to accept Dailey's unsupported allegation in her Memorandum of Law that she participated in protected speech as the leadership chair, her proof would still be lacking. Assuming Dailey could meet her initial burden under <u>McDonnell Douglas</u>, the burden of production would shift to defendants to offer a legitimate reason for Dailey's reassignment.

Defendants have offered evidence, which Dailey has not seriously countered, establishing a non-retaliatory reason – a concern that Dailey was involved with the threats made towards Patni – for Dailey's reassignment.  See Def. R56.1 ¶ 70; Tyler Dep. 10; Kase Dep. Vol. I 17-18.[5]

As Dailey points out, Patni testified at her deposition that she never accused Dailey of making threats against her.  Patni Dep. 31-39.  Moreover, the initial incident and police reports which detail the threats do not identify a suspect.  Pl. Exs. E, I.  However, defendants have put forth evidence corroborating their contention that they believed Dailey was likely the source of the threats against Patni.  Detective Walters testified at his deposition that Patni told him that Dailey and Patni did not get along, and that Dailey was the only person at the school with whom she had experienced difficulty.  Walters Dep. 20.  In addition, other unnamed sources told Walters that Dailey was involved in the incidents at the school.  Walters Dep. 24.  Dr. Kase stated in her deposition that she first learned that Dailey was suspected of making threats to Patni from the school's acting principal, Judith Tyler, and that Patni herself subsequently reported to Kase that Dailey was likely the person who threatened her, a conclusion Patni reached at least in part because of prior confrontations between them when Dailey had used threatening language.  Kase Dep. Vol. I 17-18.

Any inconsistency between Patni's testimony, in which she stated that she did not identify Dailey as the person who threatened her, and Kase's testimony, in which she states that Patni told her she believed Dailey was the one who threatened her, is sufficient to raise a question of fact with respect to whether Patni actually accused Dailey of making threats.  However, the factual dispute would not be material; even if Dr. Kase suspected Dailey might have been responsible for

---

[5]The Kase deposition excerpt referred to in the text has been submitted as Plaintiff's Exhibit C.

Patni's harassment based upon information from others, or even if Kase jumped to that conclusion for no apparent reason, and further decided that an investigation should be conducted and Dailey reassigned while the investigation was pending, this would not be actionable, at least in the absence of any evidence that Kase took these actions because of Dailey's race or protected speech.

Dr. Kase testified at her deposition that she directed Dailey be reassigned out of a concern for safety while the matter was under investigation. Kase Dep. Vol. I 37. Because defendants have put forward a non-retaliatory and non-discriminatory reason for Dailey's reassignment, Dailey must, to avoid summary judgment against her, come forward with evidence that defendants' stated reasons are pretextual. Instead, Dailey simply argues that there was no basis to suspect her of being involved in the Patni incidents and that those incidents must therefore be a pretext for the real reason for her reassignment. Pl. Mem. 7. This unsupported conjecture is insufficient to defeat summary judgment.

*Plaintiffs' Race Discrimination Claims*

Plaintiffs have offered no evidence of racial discrimination. Plaintiffs' entire argument with respect to race-based discrimination seems to be that McCants and Dailey are both black and were both removed from their classrooms less than three weeks before the end of the school year. Pl. Mem. 13. As plaintiffs concede, however, two white teachers were also removed and reassigned to district offices during the same school year. Id.; Dailey Aff. ¶ 35. Plaintiffs do point out that these white teachers, unlike plaintiffs, were reassigned to other schools before the school year ended. Id. The record is silent, however, as to when during the school year these teachers were first reassigned to district offices, or how long they were assigned there before

being appointed to a new school. It may well be, particularly because plaintiffs' reassignments took place as the school year was coming to a close, that there was simply insufficient time to find a new assignment for either of them before the school year ended. In any event, there is no basis to infer that race-based discrimination motivated plaintiffs' reassignments.

*Adverse Employment Action*

As an alternative basis for summary judgment, defendants argue that plaintiffs' reassignments did not amount to adverse employment actions. Plaintiffs have presented evidence, however, that Dailey and McCants, both tenured teachers, were stripped of their teaching responsibilities and assigned to the Superintendent's Office. Pl. Ex. B. When they arrived, there was no work for them to do. McCants Aff. ¶ 30. Dailey only spent a few days there, but McCants was assigned to the office from June of 2000 to September of 2001. Dailey Aff. ¶ 32; McCants Aff. ¶ 4. Dailey, however, states that she lost seniority and that her career has suffered because she is no longer on a leadership committee and has been denied after-school and summer positions. Dailey Aff. ¶ 36. On the other hand, plaintiffs do not seem to have suffered any long-term setback to their careers, as both of their records were cleared and both ultimately returned to teaching at new schools. Def. R56.1 ¶¶ 45, 46, 48, 83, 85. The record contains no evidence of any significant differences between their current teaching positions and their former positions at P.S. 40. Moreover, despite being reassigned to the Superintendent's Office, plaintiffs were paid their regular salaries, including the 15% pay differentials, and paid for summer school even though they did not teach during the summer. Def. R56.1 ¶¶ 47, 50, 83, 84. It appears, however, that plaintiffs may have lost the pay differential when they began at their new schools.

A transfer or reassignment may constitute an adverse employment action "if it results in a change in responsibilities so significant as to constitute a [demotion]" or if the reassignment is to a position that is "materially less suited to [one's] skills and expertise." Galabya v. New York City Bd. of Educ., 202 F.3d 636, 641 (2d Cir. 2000) (finding that plaintiff's transfer from one school to another with a change in classes taught was not an adverse employment action). "[C]ourts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse'." Wannamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997). Whether plaintiffs have presented sufficient evidence to demonstrate that they have suffered an adverse employment consequence presents a close question, particularly in Dailey's case, but one which I would be inclined, for purposes of summary judgment, to answer in plaintiffs' favor. However, because I recommend that defendants be granted summary judgment on plaintiffs' race discrimination and First Amendment retaliation claims on other grounds, I do not reach defendants' alternative argument that plaintiffs did not suffer an adverse employment action.

In sum, plaintiffs have failed to adduce evidence sufficient to support a finding that defendants' stated reasons for their reassignments are pretextual and that the true reasons involve retaliation for protected speech or race-based discrimination. I therefore respectfully recommend that defendants' motion for summary judgment be granted with respect to plaintiffs' First Amendment and Equal Protection claims brought pursuant to Section 1983. Moreover, because a Section 1985 claim must also be supported by a showing of discriminatory animus, I recommend that summary judgment be granted on plaintiffs' Section 1985 claims as well.

D.    Plaintiffs' Due Process Claims

Plaintiffs next contend that their reassignments to the Superintendent's Office without formal charges or a hearing violated their constitutional right to due process. "The first question in any due process inquiry is whether the plaintiff has a constitutionally protected interest." DeMichele v. Greenburgh Cent. Sch. Dist. No. 7, 167 F.3d 784, 789 (2d Cir. 1999). "[P]laintiff must show that she has a property interest, created by state law, in the employment or the benefit that was removed." Bernheim v. Litt, 79 F.3d 318, 322 (2d Cir. 1996). The Second Circuit has recognized that tenured teachers have constitutionally-protected property interests in their positions and that due process must be afforded prior to termination. See, e.g., Shaffer v. Schenectady City Sch. Dist., 245 F.3d 41 (2d Cir. 2001); Strong v. Bd. of Educ., 902 F.2d 208, 211 (2d Cir.1990). However, changes in working conditions such as plaintiffs endured here do not implicate a constitutionally-recognized property interest. See Bernheim, 79 F.3d at 323. Furthermore, plaintiffs had available to them employee grievance procedures and Article 78 proceedings which provided adequate due process to protect whatever rights they may have had. Id; Giglio v. Dunn, 732 F.2d 1133 (2d Cir. 1984). Indeed, plaintiffs invoked the grievance procedures available to them through their union. Thus, I respectfully recommend that summary judgment be granted with respect to plaintiffs' procedural due process claims as well.

E.    Plaintiffs' State Law Claims

When federal claims are dismissed before trial, a court may nevertheless exercise its discretion to retain pendent jurisdiction of a plaintiffs' state law claims. See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 348-51, 108 S.Ct. 614 (1988); Rosado v. Wyman, 397 U.S. 397, 404-405, 90 S.Ct. 1205 (1970). Generally, the balance of factors of judicial economy,

convenience, fairness, and comity suggest that jurisdiction over pendent state claims should be declined when federal claims are dismissed before trial. See United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139 (1966). This is not, however, an inflexible rule. Carnegie-Mellon Univ., 484 U.S. at 350 n.7, 108 S.Ct. at 619 n.7.

In light of the extensive discovery and briefing in this case, an exercise of pendent jurisdiction over plaintiffs' state law claims is warranted. See Gray v. Int'l Ass'n of Heat & Frost Insulators and Asbestos Workers, Local 51, 447 F.2d 1118, 1120 (6th Cir. 1971) ("In view of the substantial time and energy that had already been expended at the time these claims were dismissed, the District Court clearly had the discretion and power to retain jurisdiction of the pendent state claim.); Kreuter v. Reuter, No. 01-CV-5229, 2002 WL 31946715, at * 9 (E.D.N.Y. Dec. 05, 2002). Because it is clear that plaintiffs cannot succeed on their state law claims, I recommend they be dismissed on summary judgment as well.

*Plaintiffs' Slander Claims*

Under New York law, to sustain a cause of action for slander, a plaintiff must establish "(i) a defamatory statement of fact, (ii) that is false, (iii) [spoken] to a third party, (iv) 'of and concerning' the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) [] causing special harm . . ., and (vii) not protected by privilege." Albert v. Loksen, 239 F.3d 256, 265-66 (2d Cir. 2001) (citing Dillon v. City of New York, 261 A.D.2d 34, 37-38, 704 N.Y.S.2d 1, 5 (1st Dep't 1999)). Plaintiffs' claims of slander are based on statements made by Dr. Kase at a PTA meeting in June of 2000. Plaintiffs allege that, at this meeting, Kase maliciously stated that Dailey was under investigation and McCants was incompetent as a teacher. Compl. ¶¶ 41, 42. However, plaintiffs have failed to offer in opposition to defendants'

motion the testimony of anyone who heard Dr. Kase make these statements, but instead appear to rely only upon inadmissible hearsay. Dailey Aff. ¶ 27.

Furthermore, plaintiffs would be unable to establish at trial that the statements concerning their reassignments were false. Rather, as discussed above, the evidence presented in connection with the pending motion indicates that Dailey was in fact under investigation for the harassment of Patni and that McCants was removed due to concerns about her competence as a teacher. Def. R56.1 ¶¶ 17, 22, 63, 68. It is objectively true that Dailey was under investigation in connection with Patni's complaint of threats. Whether a teacher such as McCants is incompetent is at least arguably a subjective question; in any event, Kase's assertion about the quality of McCants' teaching was based on a specific, detailed list of perceived deficiencies. Def. Exs. G, I.

In their Memorandum of Law, plaintiffs point to certain statements attributed to Dr. Kase in newspaper articles. Pl. Mem. 15. However, the only statements attributed to Dr. Kase in these articles are a general statement referring to an investigation of Dailey and refusals to answer further questions. In one article cited by plaintiffs, it was reported that "[t]he school district's superintendent would not comment on the reason for the removal", except to say that "Dailey is currently part of an ongoing investigation." Pl. Ex. O. A second article stated that "[s]chool officials . . . refused to say why Dailey was pulled from the classroom" and that Kase specifically "refused . . . to discuss the specifics of Dailey's removal . . . ." Pl. Ex. L. Ironically, Dailey herself is quoted in the article as having said that she is "under suspicion in connection with several threatening letters and E-mails sent to an East Asian teacher at P.S. 40". Id.

For all these reasons, I respectfully recommend that defendants' motion for summary judgment on plaintiffs' claims for slander be granted.

b.    *Emotional Distress Claims*

In their complaint, plaintiffs allege that the defendants intentionally caused plaintiffs to suffer emotional distress.[6]  Compl. ¶¶ 46, 47.  However, "[i]t is well-settled that public policy bars claims sounding in intentional infliction of emotional distress against a government entity." Lauer v. City of New York, 240 A.D.2d 543, 544 (2d Dep't 1997), appeal denied 91 N.Y.2d 807 (1998) (citations omitted).

Even if the Court were to permit the claim to go forward, plaintiffs would be unable to establish the rigorous elements of (i) extreme and outrageous conduct, (ii) the intent to cause emotional distress, (iii) a causal connection between the conduct and the alleged injury, and (iv) severe emotional distress.  See Howell v. New York Post Co., Inc., 596 N.Y.S.2d 350, 353 (1993) (noting that every intentional infliction of emotional distress claim before the Court of Appeals has failed because the alleged conduct was not sufficiently outrageous).  Plaintiffs argue that the defendants' extreme and outrageous conduct includes reassigning plaintiffs without basis or notice, accusing Dailey of committing a bias crime, refusing Dailey entry to the school to get her medication, and forcing McCants to undergo a psychiatric examination "for no discernible reason other than to cause her distress".  Pl. Mem. 16.  However, the decision to require McCants to undergo an examination was based on specific instances of erratic behavior.  Def. Ex. N. Moreover, it is undisputed that McCants had a significant psychiatric history.  Def. Ex. T at 4 (referring to a two-month hospitalization to address depression and manic behavior).  Although defendants' refusal to allow Dailey to return to the school building to obtain her medication is

---

[6]Plaintiffs appear to have abandoned any claims of negligent infliction of emotional distress; their Memorandum of Law discusses only intentional infliction.  Pl. Mem. 16.

serious, it does not constitute conduct "beyond all possible bounds of decency," particularly at a time when an investigation into whether Dailey had threatened a fellow teacher was pending. Howell, 596 N.Y.S.2d at 353, citing Murphy v. Am. Home Products Corp., 461 N.Y.S.2d 232 (1983). Finally, plaintiffs fail to cite any medical evidence of any severe emotional distress they suffered, and this in and of itself is fatal to their claims. See Walentas v. Johnes, 257 A.D.2d 352, 353, 683 N.Y.S.2d 56, 58 (1st Dep't 1999). Plaintiffs' claims of emotional distress, therefore, should also be dismissed with prejudice.

## Conclusion

For all these reasons, I respectfully recommend that defendants' motion for summary judgment be granted. Any objections to the recommendations made in this Report must be filed with the Clerk of the Court and the Chambers of the Honorable Carol B. Amon within ten days of receiving this Report and Recommendation and, in any event, on or before March 25, 2005. Failure to file timely objections may waive the right to appeal the District Court's Order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; Small v. Secretary of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).


_____/s/_____
**Steven M. Gold**
**United States Magistrate Judge**


**March 11, 2005**
**Brooklyn, New York**


C:\MyFiles\mccants sj smg.wpd